# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 3:16-cr-00011-SMR-SBJ |
| ) | |
| Plaintiff, ) | |
| ) | **REPORT AND RECOMMENDATION ON** |
| v. ) | **DEFENDANT'S MOTIONS TO SUPPRESS** |
| ) | |
| HERMAN TERRILL BAYLOR ) | |
| ) | |
| Defendant. ) | |

This matter comes before the Court pursuant to the Motion to Suppress Eyewitness Identification and Request for Evidentiary Hearing (Dkt. No. 24) and supporting Brief (Dkt. No. 24-1) and Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. No. 25) and supporting Brief (Dkt. No. 25-1), filed by Herman Terrill Baylor ("Defendant") on July 11, 2016. The Government resisted both motions on July 25, 2016. (Dkt. Nos. 39 & 40). These matters were referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for report and recommendation by District Judge Stephanie M. Rose. (*See* Dkt. No. 31). Trial is set for August 16, 2016. (Dkt. No. 36).

An evidentiary hearing was held on July 29, 2016. Defendant appeared personally and with his attorney, Terry McAtee. The Government appeared by Assistant U.S. Attorney Will Ripley. The Court received Government's Exhibit 1, a copy of the photo lineup presented to the witness; Government's Exhibit 2, a copy of the photo lineup with names identifying the individuals depicted therein; and Government's Exhibit 3, an audio recording of the interview of the witness presented with the photo lineup. The Court also received Defendant's Exhibit A, the January 15, 2016 search warrant and affidavit in support thereof, and Defendant's Exhibit B, the January 28, 2016 search warrant and affidavit in support thereof. Scott County Sheriff

1

Department Detective Dan Furlong, Davenport Police Department Detective Brian Morel, and witness John Cannella all testified. Defendant submitted a post hearing supplemental brief (Dkt. No. 56) on August 2, 2016. The Government also submitted post hearing supplemental briefs (Dkt. Nos. 57 & 58) on August 2, 2016. The matter is fully submitted.

This Magistrate Judge has carefully considered the record evidence, the arguments and statements of counsel and submits the following report. As set forth below, based on the facts presented and applicable law, it is recommended that both motions be denied.

## I.  FINDINGS OF FACT

Defendant was indicted on March 16, 2016, on one count of being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Dkt. No. 2). Defendant is alleged to having a previous conviction for a crime punishable by imprisonment in excess of one year and to possessing a Mossberg 835 12 gauge shotgun and a Savage 9478 10 gauge shotgun. (*Id*.). This allegation arose from a burglary that took place on December 7, 2015 at Redwood Avenue, Davenport, Iowa, during which two shotguns were stolen. The victim of the burglary, Joseph Britton, reported to the Davenport Police Department that he suspected John Cannella ("Cannella"), Joshua Benes ("Benes") and/or Dillon Adams ("Adams"), individuals he was acquainted with, of committing the crime.

On December 17, 2015, Markkus Robinson (Defendant's brother-in-law) reported to the Davenport Police Department that Defendant was storing two shotguns in Robinson's basement because the Defendant was a convicted felon. Robinson reported that he did not want the firearms at his residence. Davenport Police Officers responded, found and retrieved two

shotguns from the basement of Robinson's residence. Joseph Britton subsequently identified these two shotguns as the firearms stolen from him on December 7, 2015.

On December 21, 2015, during a separate drug investigation, Scott County Sheriff Department Sergeant Joe Caffrey and Detective Dan Furlong interviewed Cannella. On that date, Detective Furlong executed a search warrant at Cannella's residence, at which time Cannella was arrested for methamphetamine related offenses. Prior to the execution of the search warrant, Detective Furlong knew that Cannella was a suspect in the shotgun theft. At his interview, Cannella stated that he did not steal the shotguns, but that he knew who did -- Benes and Adams. Cannella further reported to Detective Furlong that Benes and Adams used Cannella's cell phone to contact an individual known as "C Dude" about selling the shotguns to C Dude in exchange for crack cocaine. Cannella reported that the shotguns were, in fact, sold to C Dude, a black male, and that he observed this transaction in the area of 15th and Warren Streets in Davenport. Cannella gave Detective Furlong two phone numbers he thought might belong to C Dude, but stated that C Dude's phone number was saved in his phone's contact list. Detective Furlong reported this information to Davenport Police Department Detective Brian Morel.

Detective Morel conducted the weapons investigation concerning these shotguns for the Davenport Police Department. On January 15, 2016, Detective Morel created a six photo lineup to be presented to Cannella for identification. In describing the process he used to create the photo lineup, Detective Morel noted a six person composite photo lineup is the current format utilized by the Davenport Police Department. Detective Morel testified that his objective was to make the lineup as impartial as possible, and to limit any possibility of influence. To create the

photo lineup, Detective Morel accessed a computerized record system that is utilized by several Quad Cities law enforcement agencies. He set forth criteria to search the system based upon factors such as height, weight, age, sex, and race that would be similar to the Defendant. Detective Morel attempted to create a lineup with similar looking individuals. He testified that in this case, as is his regular practice, he used an independent investigator who did not know the identity of the suspect, to present the photo lineup to the witness. In this manner, because the presenting investigator had no knowledge about the matter at hand, Detective Morel was confident that nothing would occur purposely or accidentally to influence the identification.

Detective Furlong received the photo lineup, Government's Exhibit 1, from Sergeant Caffrey, who received it from Detective Morel. Detective Furlong then met with Cannella, on January 15, 2016, to continue the investigation. Detective Furlong asked Cannella if he would recognize C Dude if he saw a picture of him. Cannella responded that he would. Detective Furlong testified that he placed the photo lineup, Government's Exhibit 1, in front of Cannella, and that Cannella immediately pointed to the picture and identified photo number three as C Dude. Detective Furlong testified that Cannella did not hesitate in identifying photo number three and that Cannella put his finger directly on photo number three. Cannella circled the photograph he identified, wrote his initials, and dated the photo lineup. Detective Furlong then wrote at the bottom of the photo lineup the date, time, that Cannella identified photo number three, and that Sergeant Caffrey and himself witnessed the identification.

In addition, Cannella's cell phone was provided to him during the interview. Cannella gave Detective Furlong the password for his phone. Detective Furlong then searched the contact list in the phone for C Dude and identified C Dude's telephone number as (xxx)-xxx-5638.

Detective Furlong reported this information immediately to Detective Morel, and provided to him the photo lineup that had been presented to, and initialed by Cannella.

Detective Morel used this information as part of the affidavit in support of a January 15, 2016 search warrant (Defendant's Exhibit A) seeking to search the Defendant's residence. During the execution of this search warrant, Ira Euring was arrested on an outstanding warrant, and the Defendant was arrested for state charges related to his alleged possession of the shotguns. Detective Morel testified that Officer Brenda Waline took the Defendant's cell phone from him either during the initial pat down of Defendant upon his arrest or with the receipt of his personal property prior to putting the Defendant into an interview room at the Davenport Police Department. Detective Morel testified that he listed on the search warrant return all of the property seized during the execution of the search warrant and the arrest of Defendant. He did this in order to be comprehensive, and because it encompassed everything taken during all of the activities related to the search. Detective Morel further testified that he has not reviewed the contents of the cell phone, nor has he ever obtained or sought to obtain a search warrant to search the cell phone seized during the Defendant's arrest.

Instead, Detective Morel testified that on January 28, 2016 he sought a search warrant, (Defendant's Exhibit B), to obtain records from iWireless of text messages, phone calls and location information for the time frame of December 10, 2015 to December 20, 2015 for the phone number attributed to C Dude by Cannella. Detective Morel had received previous confirmation from iWireless that the phone number attributed to C Dude by Cannella was, in fact, issued to the Defendant. Detective Morel stated that this search warrant was an attempt to narrow and be specific in a search of information relating to communications between Cannella's

colleagues and C Dude concerning the sale of the shotguns. In this manner, a search of Defendant's phone would not be necessary. Detective Morel also testified that, at this point, he is unable to connect the cell phone seized from the Defendant with the phone number given to authorities by Cannella and listed on the January 28, 2016 search warrant.

Detective Furlong testified that, on February 1, 2016, he generated a report of his January 15, 2016 interview of Cannella. In that report, Detective Furlong stated that C Dude is Ira Euring. Detective Furlong testified that this was an error on his part, that he simply mixed up the names of Euring and the Defendant, and that this had nothing to do with Cannella's actions or statements during the interview. In fact, at that interview, Detective Furlong did not know the actual name of C Dude. Cannella also indicated during the interview that he did not know C Dude's real name. Detective Furlong later corrected this error in a supplement to his February 1, 2016 report.

Cannella testified in a consistent matter concerning the investigation and interviews. Cannella testified he told Detective Furlong and Sergeant Caffrey about the sale of the two shotguns, and that Benes and Adams used his phone to contact C Dude to set up the transaction. Cannella recalled that during the January 15, 2016 interview, the officers brought his cell phone to the interview and allowed him to access C Dude's contact information from the phone. With respect to the photo lineup, Cannella testified that he circled the individual in photo number three because he looked like the person the shotguns were sold to. Cannella personally circled photo number three, wrote the date, and initialed it.

Cannella further testified that he saw C Dude for the first time in the area of 15th and Warren Streets in Davenport. He was in a car and C Dude was on the porch of a residence,

approximately 50 feet away, at night. Benes and Adams met C Dude on the porch and exchanged the shotguns in return for crack cocaine from C Dude. Cannella testified he did not get the best look at C Dude. However, Cannella saw him again one to two days later when C Dude sold crack cocaine to others in the presence of Cannella at a residence where Cannella was. Cannella indicated he was "high" on both of the occasions he saw C Dude, but the person he circled on the photo lineup is the person he saw on the porch receive the shotguns from Benes and Adams and is the same person he saw at the house a couple of days later.

## II.   ANALYSIS

The Defendant asks the Court to suppress the evidence of John Cannella's eyewitness identification. He alleges that the identification process was impermissibly suggestive and unreliable and would taint any identification in court. (Dkt. No. 24 at 1). The Defendant also asks the Court to suppress the evidence obtained through the search of the Defendant's residence and the alleged search of his cellular phone. (Dkt. No. 25 at 1). He claims that both were illegal searches. (*Id.*). The Government resists both motions.

### A.   Admissibility of Identification

When determining whether identification testimony is admissible, a court must consider: (1) whether the identification procedures were impermissibly suggestive, and (2) if they were, whether under the totality of the circumstances the suggestive procedures created a very substantial likelihood of irreparable misidentification. *Briscoe v. City of St. Louis*, 690 F.3d 1004, 1012 (8th Cir. 2012); *United States v. Granados*, 596 F.3d 970, 974 (8th Cir. 2010) (citing *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003)). *See also United States v. Omar*,

786 F.3d 1104, 1108 (8th Cir. 2015); *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004) (citing *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984)).

In *United States v. Wilson*, the Eighth Circuit found that a lineup was not impermissibly suggestive when the photo-spread depicted individuals with "considerable similarity of hair color, style, general physical build, and skin tone." 787 F.2d 375, 385 (8th Cir. 1986). However, the court stated that, "[a] photo-spread displaying persons of markedly different race or ethnicity may be unduly suggestive." *Id*.

Here Defendant argues that the identification process was impermissibly suggestive because, during the lineup procedure, Canella stated that all of the photographs in the lineup looked like "C Dude."  (Dkt. No. 24-1 at 2). The Defendant also claims that presenting all six photographs to Cannella at once, rather than one at a time, was suggestive.

In response, the Government asserts that presenting all six photographs at once is a common and even preferred method of identification. (Dkt. No. 39 at 6). The Government also asserts that Detective Furlong did not know which photograph depicted the Defendant or that the Defendant was the Davenport Police Department's suspect. Finally, the Government claims that Cannella immediately identified the Defendant.

After considering the parties' arguments, this Magistrate Judge finds that the photo identification process used with Cannella was not impermissibly suggestive.   Detective Morel testified credibly as to the measures he takes in creating a photo lineup to make sure that the lineup is not suggestive and that the process used in presenting the photo lineup to a witness is impartial.  Specifically, Detective Morel testified as to how he accesses the data base to create a photo lineup of individuals with similar appearances, based upon their height, weight, age, sex

and race.   From a review of the photo lineup (Governments' Exhibit 1), it is clear that the individuals depicted have a similarity of hair color, hair style, skin tone and general physical build.  Indeed, the individuals depicted in the photo lineup do look similar, as Detective Morel indicated was his preference.

Further, the use of an independent investigator to present the photo lineup, who is unaware of who the suspect is, also supports a finding that the photo identification process used is not impermissibly suggestive.   As mentioned by Detective Morel, using someone who has no knowledge about the investigation greatly reduces the possibility that something will occur, either intentionally or accidentally, to influence the identification.  Indeed, Detective Furlong testified that when he presented the photo lineup to Cannella, he did not know which photo identified the suspect.

Cannella's comment in reference to the photo lineup that C Dude looks "like a lot of them" does not suggest that the photo lineup was impermissibly suggestive.   From a close review of the statements made by Cannella and Detective Furlong in the audio recording of the January 15, 2016 interview (Government's Exhibit 3), when presented with the photo lineup, Cannella appears to state, "He looks a lot … like a lot of them - right there."  Detective Furlong then immediately asks "Photo number three?"  Cannella responds with a slightly audible, but affirmative, response.  Listening to the recording, one is unable to tell what nonverbal communication or actions were taken by either Cannella or Detective Furlong during this time.  However, at the hearing in this matter, both Detective Furlong and Cannella testified consistently with each other that, when asked to identify C Dude, Cannella clearly pointed to photo number three.  That testimony is not contradicted by anything in the audio recording; in fact, when

considering the timing of Detective Furlong's question to Cannella, "photo number three?" it seems that question was in reference to Cannella pointing at photo number three after he stated "right there." Further, any comment by Cannella that could be interpreted as Cannella indicating that the people in all of the photos look similar, only supports the conclusion that none of the photos in this lineup stood out from the other photos in an inappropriately suggestive manner.

Defendant's argument that presenting all six photographs in a photo lineup at once, rather than one at a time, is suggestive is without merit. Defendant cites no cases in support of this proposition. The Eighth Circuit has approved identifications using composite photo lineups, challenged on other grounds. *See United States v. Harris*, 636 F.3d 1023, 1024-1026 (8th Cir. 2011) (finding a six person composite lineup where the photographs used had different background colors not impermissibly suggestive).

If a court finds the identification procedures were impermissibly suggestive, then the court must consider, whether under the totality of the circumstances, the suggestive procedures created a very substantial likelihood of irreparable misidentification. *Martin*, 391 F.3d at 952 (citing *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984)). Although this Magistrate Judge finds the identification procedures not to be impermissibly suggestive, this issue will be examined due to Defendant's contention that Cannella actually identified someone other than C Dude and the impact this contention has on other issues raised by Defendant in support of his motion concerning the two search warrants.

To determine whether the identification procedure created a substantial likelihood of irreparable misidentification, the following factors are considered:

> "the opportunity of the witness to view the suspect during the commission of the crime; the witness's degree of attention; the accuracy of the witness's prior

description of the suspect; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation." *Martin*, 391 F.3d at 953 (quoting *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *Wilson*, 787 F.2d at 385. If there is not a very substantial likelihood of irreparable misidentification, "the evidence is for the jury to weigh." *Wilson*, 787 F.2d at 386.

The Defendant argues that the identification process was unreliable and likely to create an irreparable misidentification because 1) "the witness was not shown the lineup until weeks after he witnessed the alleged event," 2) "the witness did not provide a detailed description of the suspect prior to the presentation of photos," 3) "the witness did not know the actual name of the suspect," and 4) "one of the officers present during the procedure indicated that the witness identified another individual as 'C Dude.'" (Dkt. 24-1 at 3).

The Government contends the identification process was not unreliable or likely to create an irreparable misidentification. (Dkt. No. 39 at 6). According to the Government, in his February 1 report, Detective Furlong did not state that Cannella identified another individual as C Dude, but rather stated that C Dude's real name was Ira Euring. (*Id*.). The Government argues that this statement was a typographical error regarding C Dude's identity and has no bearing on the identification process. (*Id*. at 6-7).

In considering the relevant factors, the evidence demonstrates that Cannella made the identification approximately one month after he saw C Dude conduct the shotgun transaction. Cannella testified that on the first occasion that he saw C Dude, he did not get "the greatest look at him." He testified that he did see C Dude on a second occasion a couple of days later. Further, he admitted that he was "high" on both occasions that he saw C Dude.

However, when asked whether he would be able to identify C Dude if he saw a picture of him, Cannella did not hesitate in confirming that he would be able to. When actually presented with the photo lineup, Cannella made a comment suggesting that C Dude looked like a lot of the people depicted in the photo lineup. However, immediately after making that comment, he did not hesitate, and pointed directly at photo number three, which was the photo of the Defendant. Under the totality of these circumstances, this suggests a high degree of reliability in the identification. The fact that Cannella did, so quickly, actually identify the Defendant further confirms the reliability of this identification. As such, the issues raised by the Defendant do not present substantial likelihood of irreparable misidentification, but rather is evidence is for the jury to weigh. *See Wilson*, 787 F.2d at 386.

Further, no evidence is presented that during the identification Cannella ever identified C Dude as someone other than photo three in the photo lineup. As noted by the Government, it appears that this contention arises out of Detective Furlong's February 1, 2016 report of his January 15, 2016 interview with Cannella. Detective Furlong was credible and firm in his assertions that he was the person responsible for attaching the incorrect name to the photograph identified by Cannella as C Dude in his report. Indeed, Detective Furlong did not know the names of any of the individuals in the photo lineup when he presented it to Cannella. The evidence is also clear, based on the testimony of both Detective Furlong and Cannella, that Cannella only ever identified photo number three as C Dude. Finally, Cannella stated in the interview (as is reflected on Government's Exhibit 3) that he did not know C Dude's real name.

12

B.   **Admissibility of Evidence Procured Through Search Warrants**

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution. amend. IV. The Court employs a totality of the circumstances analysis when determining if there is probable cause to issue a search warrant. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986); *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). A magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him…there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.; United States v. Gladney,* 48 F.3d 309, 312 (8th Cir. 1995). On review, the Court "pay[s] 'great deference' to the probable cause determinations of the issuing judge or magistrate, and limit[s]…inquiry to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (citing *Gates*, 462 U.S. at 236).

Search warrants cannot be overly broad and must meet a standard of "practical accuracy." *United States v. Jansen*, 470 F.3d 762, 766 (8th Cir. 2006); *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir. 1976) (citing *United States v. Gomez*, 42 F.R.D. 347 (S.D.N.Y. 1967)). "The constitutional standard for particularity of description in a search warrant dictates that the language be sufficiently definite to enable the searcher to reasonably ascertain and identify the

place authorized to be searched and the things authorized to be seized." *Johnson*, 541 F.2d at 1313 (citing *Steele v. United States*, 267 U.S. 498, 503-04 (1925)).

Before reviewing the existence of probable cause, the court may consider the applicability of the good-faith exception to the exclusionary rule, as established in *United States v. Leon,* 468 U.S. 897 (1984). *United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007) (citing *United States v. Warford,* 439 F.3d 836, 841 (8th Cir. 2006)). Under the good-faith exception, the court will not suppress evidence seized pursuant to a search warrant issued by a magistrate judge that is later determined to be invalid, if the executing officer's reliance upon the warrant was objectively reasonable. *Id.* The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotations and citation omitted) (alteration in original).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon,* at 923.

Additionally, even if a search warrant is supported by probable cause, the warrant may be invalid if it is based on a flawed affidavit.

place authorized to be searched and the things authorized to be seized." *Johnson*, 541 F.2d at 1313 (citing *Steele v. United States*, 267 U.S. 498, 503-04 (1925)).

Before reviewing the existence of probable cause, the court may consider the applicability of the good-faith exception to the exclusionary rule, as established in *United States v. Leon,* 468 U.S. 897 (1984). *United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007) (citing *United States v. Warford,* 439 F.3d 836, 841 (8th Cir. 2006)). Under the good-faith exception, the court will not suppress evidence seized pursuant to a search warrant issued by a magistrate judge that is later determined to be invalid, if the executing officer's reliance upon the warrant was objectively reasonable. *Id.* The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotations and citation omitted) (alteration in original).

*Leon* identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable "; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid. *Leon,* at 923.

Additionally, even if a search warrant is supported by probable cause, the warrant may be invalid if it is based on a flawed affidavit.

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-156 (1978).

A *Franks* showing also applies to omissions from an affidavit. *Butler*, 594 F.3d at 961. The Court must void a search warrant if a defendant can show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause." *Reivich*, 793 F.2d at 961 (citations omitted); *Williams*, 477 F.3d at 557.

### 1. January 15, 2016 Warrant

The Defendant argues that the January 15 warrant was not supported by probable cause. (Dkt. No. 25-1 at 3). Because the Davenport Police Department had recovered the two firearms allegedly sold to C Dude before the application for the search warrant, the Defendant contends "[t]here was no basis for concluding that any other firearms, or contraband or any kind, had been in the possession of Mr. Baylor." (*Id*. at 3-4). Further, because the affidavit supporting the search warrant failed to mention "that it was initially reported by one of the officers present that the witness identified another individual as 'C Dude,'" this "demonstrates a reckless disregard of whether the omissions made the affidavit misleading." (*Id*. at 5). The Defendant then argues that,

had this information been included in the affidavit, there was no probable cause to issue the January 15 search warrant.

The Defendant also contends the seizure of the cell phone was not supported by the warrant because the warrant did not grant explicit permission to search for a phone and the provision in the warrant allowing the seizure of "[a]ny other items related to the on-going firearm investigation" was vague and overly broad. (*Id*. at 4). Finally, the Defendant argues that the Davenport Police Department did not seize the cell phone when they executed the warrant, but seized it later, without a warrant. (*Id*. at footnote, 2).

The Government argues that the January 15 warrant demonstrated probable cause that the Defendant possessed additional firearms at his residence. (Dkt. No. 40 at 6). Even if there was no probable cause to support the search for additional firearms, the warrant encompassed many other items relevant to the firearm investigation. (*Id*. at 6).

The Government also argues that the omission of Detective Furlong's mistake as to the name of C Dude, was not made in reckless disregard of the truth as this error was unrelated to the identification process and made February 1, 2016 -- after the issuance of the search warrant. (*Id*. at 7). The Government further argues that whether or not the warrant supported the seizure of the Defendant's cell phone is irrelevant, as the cell phone was not seized upon the execution of the warrant. (*Id*.).

Reviewing the affidavit submitted with the January 15 search warrant, shows that the connection between the location to be searched, the Defendant's residence, and the property identified in the search warrant application is tenuous. While the affidavit clearly establishes the Defendant's connection to the alleged crime and that the location to be searched is connected to

the Defendant, the affidavit does not set forth facts to establish why evidence of the alleged crime or additional firearms might be located at Defendant's residence.  Indeed, the firearms at issue had already been recovered at a location *other* than Defendant's residence.  No information provided in the affidavit discusses the Defendant possessing any firearms at his residence -- either the firearms already recovered or other firearms.

Turning to the question of whether the good-faith exception to the exclusionary rule established by *Leon* applies, the Defendant contends the reliance on the warrant was unreasonable and the first, third and fourth exceptions to *Leon* apply in this case. (Dkt. No. 25-1 at 6).  However, this Magistrate Judge finds there is no evidence the affidavit contained a false statement or omission made knowingly or with reckless disregard of the facts such that the affidavit in support of the search warrant is misleading.  Defendant seems to contend that the mistake discussed by Detective Furlong in his report as to the correct name of C Dude was reckless, false and/or misleading.  In fact, as discussed above, this mistake was simply an error on Detective Furlong's part that does nothing to change, diminish or call into question Cannella's identification of C Dude.  Most notably this error appeared in a report created *after* the application for the search warrant.  For these reasons, Defendant also has failed to make the preliminary showing required for a *Franks* hearing.[1]

In addition, the Defendant does not demonstrate evidence that the warrant is so lacking in probable cause that reliance on it is entirely unreasonable.  Although the facts in the affidavit connecting the Defendant's residence to the property sought in the search warrant might be

---

[1] The Court notes that Defendant acknowledged, by virtue of the evidentiary hearing conducted, he did receive a *Franks* hearing.

tenuous, it is certainly reasonable to conclude that there might be evidence at the Defendant's residence connecting the Defendant to the alleged crime.  This is especially the case in light of the strong evidence set forth in the affidavit demonstrating the Defendant's connection to the possession of the firearms.  As such, an officer's reliance on this warrant cannot be said to be entirely unreasonable.  In addition, the Defendant does not demonstrate any facial deficiency of the warrant.  In light of this, the *Leon* good faith exception to the exclusionary rule would likely operate in favor of the Government if suppression of the evidence was warranted.

The Defendant questions the seizure of his cell phone as being beyond the scope of property the warrant allowed to be seized.  However, Detective Morel's testimony demonstrates clearly that the cell phone was not seized during the execution of the search warrant, but was obtained by Office Brenda Waline upon the arrest of the Defendant.  Given that the execution of the search warrant was in process at the time the Defendant arrived at his residence and was arrested on the state warrant, the seizure of his cell phone occurred simultaneously.   Generally, searches not supported by judicial approval are unreasonable under the Fourth Amendment.  *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, an exception to this rule is searches conducted incident to arrests. *Id*.  Based on this, even if the search warrant did not allow for the seizure of the Defendant's cell phone, a search incident to arrest would have.

Regardless of the above, the relief sought by the Defendant with respect to the property seized through the January 15, 2016 search warrant is moot.  The Government has indicated it does not intend to use the items seized – the marijuana or the cell phone itself, as evidence.  Detective Morel indicated firmly that he has not searched and will not search the cell phone.

Further, he has not sought, nor would he seek, a search warrant to search the cell phone. Because of this, Defendant's request to suppress the evidence obtained through the execution of the January 15, 2016 search warrant is moot.

### 2.  January 28, 2016 Warrant

The Defendant argues that the search warrant issued on January 28 was not supported by probable cause. The Defendant asserts that "there was no indication as to how the phone seized from Mr. Baylor was identified as being the phone from which the relevant text messages were sent and received." (Dkt. No. 25-1 at 6).

The Government argues that the January 28 search warrant only authorized a search of iWireless records for cell phone number (xxx) xxx-5638. (Dkt. No. 40 at 4-5). The Government asserts that there was never a search of the cell phone seized from Mr. Baylor, and that therefore the Defendant's claim is moot.

The Court finds the January 28 search warrant is likely supported by probable cause. The warrant sought a search of iWireless cell phone records for the phone number (xxx)-xxx-5638 to include subscriber information, calls made and received, text messages and cell tower locations from December 10, 2015 through December 20, 2015. (Defendant's Exhibit B).  In support of this request, the affidavit clearly discussed and indicated that Cannella had identified C Dude as the individual who was involved in the purchase of the shotguns from Cannella's associates.  Cannella's cell phone was presented to him in an interview.  He gave Detective Furlong the password for his phone who searched the contact list in the phone for C Dude, and identified C Dude's telephone number as (xxx)-xxx-5638.  The number provided by Cannella matches the number investigators had been provided by iWireless as having been issued to the

Defendant. Along with Cannella's testimony that he told Detective Furlong that he gave his phone to Benes and Adams in order to contact C Dude to arrange the drug and gun transaction and that he actually witnessed the subsequent transaction, this is ample probable cause for the search warrant. At the very least, based upon all of the above, this Magistrate Judge finds the warrant is not so lacking in probable cause that reliance on it is entirely unreasonable and that the application of the good faith exception to the exclusionary rule established in *Leon* would apply even in the absence of probable cause.

### Recommendation and Order

IT IS RESPECTFULLY RECOMMENDED, that Defendant's Motion to Suppress Eyewitness Identification and Request for Evidentiary Hearing (Dkt. No. 24) and Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt. No. 25) be denied.

IT IS ORDERED that, pursuant to the agreement stipulated to at the hearing in this matter, the parties shall have until 5:00 p.m. August 8, 2016 to file written objections to the Report and Recommendation, pursuant to 20 U.S.C. §636(b)(1), Fed. R. Crim. P. 59(b)(2), and Local Crim. Rule 59.

**IT IS SO ORDERED**.

**DATED** this 4th day of August, 2016.

_____
STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE